**[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 544.]**

OFFICE OF DISCIPLINARY COUNSEL *v*. ZUMSTEIN.

[Cite as *Disciplinary Counsel v. Zumstein*, 2001-Ohio-1619.]

*Attorneys at law—Misconduct—Permanent disbarment—Engaging in illegal conduct involving moral turpitude—Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation—Engaging in conduct prejudicial to the administration of justice—Engaging in conduct adversely reflecting on fitness to practice law—Failing to carry out contract for professional employment—Prejudicing or damaging client during course of professional relationship—Commingling client funds with personal funds—Failing to promptly deliver to client funds to which the client is entitled.*

(No. 01-750—Submitted June 20, 2001—Decided October 31, 2001.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 00-80.

————————————

*Per Curiam.*

{¶ 1} In 1998, First American Title Insurance Company ("First American") began an audit of Capital Title Agency, Inc. ("Capital Title"), an Ohio corporation that operated as a title insurance agent for First American and whose president was respondent, R. William Zumstein of Columbus, Ohio, Attorney Registration No. 0020944.

{¶ 2} In March 1999, Tracy L. Daugherty obtained a mortgage loan from City Mortgage Company/Washtenaw Mortgage Company to pay off his existing mortgage with Atlantic Mortgage and Investment Corporation ("Atlantic Mortgage") of Jacksonville, Florida, pay off some credit card debts, and provide funds for new windows for his house. The loan was to close at Capital Title, and

Daugherty engaged respondent to represent him during the closing. Respondent assured Daugherty that following the closing his existing mortgage would be paid off by Capital Title. Although the new mortgagee transferred sufficient funds into the escrow controlled by Capital Title, the check respondent drew on the escrow account that was payable to Atlantic Mortgage was dishonored for insufficient funds.

{¶ 3} Atlantic Mortgage then indicated that it was contemplating beginning foreclosure proceedings against Daugherty, who then sued Capital Title and First American. The suit was settled, and as part of the settlement respondent was personally to pay $8,000 in damages to Daugherty in two $4,000 installments. Against the express instructions of First American's Vice-President and Ohio manager, respondent withdrew the funds for these two checks from Capital Title's escrow accounts.

{¶ 4} In April, July, and August 1999, respondent caused checks from Capital Title's newly opened escrow account to be issued to Kim Anderson in the amounts of $800, $1,870, and $2,000. These checks were unrelated to any real estate transactions in which Capital Title was involved. In December 1999, respondent wrote a check for $15,000 to Nawal K. Pandey from Capital Title's new escrow account unrelated to any real estate transaction in which Capital Title was involved. In April 1999, respondent also made cash withdrawals of $6,000, $706, and $1,294 from the new escrow account for his own benefit. He also withdrew $4,000 from the new escrow account for his own benefit in October 1999. During the period in question, respondent's misuse of the Capital Title escrow accounts resulted in more than fifty overdraft situations.

{¶ 5} The "Good Funds Law," R.C. 1349.21(B)(5), provides that, in certain situations applicable here, no escrow or closing agent shall accept a personal check in excess of $1,000. Nevertheless, on March 28, 2000, respondent accepted four separate personal checks from Carlysle W. Coleman in the amounts of $15,411.56,

$16,339.45, $14,796.57, and $16,957.38 for deposit in the Capital Title escrow account in connection with a real estate purchase by Coleman. All four of the checks were dishonored for insufficient funds.

{¶ 6} In June 1998, respondent made a $14,500 loan to Sonny Yinger. The Vice-President for First American discovered the note for this loan in Capital Title's records. When asked at his deposition whether he had ever loaned money out of the Capital Title escrow account, respondent said that he had not.

{¶ 7} In February 2000, respondent prepared a deed transferring real estate from "A-Corp., an Ohio Corporation," to Fred M. Slade for $66,000. "A-Corp." is not and was not ever an Ohio corporation. Capital Title then issued checks in the amount of $7,000 and $10,716.49 payable to "A-Corp. or Kim Anderson," which Kim Anderson cashed.

{¶ 8} In April 2000, respondent prepared a deed transferring real estate from "PSI Group, Inc., a corporation organized and existing under the laws of the state of Ohio," to Fred Slade. The deed was executed for PSI Group by "Kim Anderson, its President," although PSI was not an Ohio corporation and Kim Anderson was not its president. Earlier, in October 1999, respondent prepared a deed transferring real estate from "PSI Group, Inc., an Ohio Corporation," to Kim Anderson. The deed indicated that it was executed for PSI Group by "Kim Anderson, President."

{¶ 9} Based on a grievance filed against respondent, Office of Disciplinary Counsel ("relator") began an investigation of respondent's activities in connection with Capital Title, which included taking respondent's deposition. On August 14, 2000, relator filed a complaint charging the respondent with the activities outlined above and alleged that they constituted violations of the Code of Professional Responsibility. Respondent failed to answer, and the matter was submitted by the Board of Commissioners on Grievances and Discipline of the Supreme Court

("board") to Master Commissioner Harry W. White for ruling on relator's motion for default, pursuant to Gov.Bar R. V(6)(F)(2).

{¶ 10} The Master Commissioner found the facts as stated and concluded that respondent violated DR 1-102(A)(3) (engaging in illegal conduct involving moral turpitude), 1-102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice), 1-102(A)(6) (a lawyer shall not engage in conduct adversely reflecting on the lawyer's fitness to practice law), 7-101(A)(2) (a lawyer shall not fail to carry out a contract for professional employment), 7-101(A)(3) (a lawyer shall not prejudice or damage his client during course of professional relationship), 9-102(A) (a lawyer shall not commingle funds of a client with personal funds), and 9-102(B)(4) (a lawyer shall promptly deliver to the client funds or property to which the client is entitled). The Master Commissioner recommended that respondent be permanently disbarred from the practice of law in Ohio. The board adopted the findings, conclusions, and recommendation of the Master Commissioner.

{¶ 11} We have reviewed the record and adopt the findings, conclusions, and recommendation of the board. As we noted in *Cleveland Bar Assn. v. Belock* (1998), 82 Ohio St.3d 98, 100, 694 N.E.2d 897, 899, "The continuing public confidence in the judicial system and the bar requires that the strictest discipline be imposed in misappropriation cases." Accordingly, respondent is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

*Jonathan E. Coughlan*, Disciplinary Counsel, and *Lori J. Brown*, First Assistant Disciplinary Counsel, for relator.

_____